No. 64,129

STATE OF KANSAS, *Appellee,* v. DAVID F.B. ZAMORA, *Appellant.*

(803 P.2d 568)

Opinion filed December 14, 1990.

*Charles D. Dedmon,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Bruce L. Stewart,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Robert T. Stephan,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This criminal case concerns: (1) prosecutorial misconduct in closing argument; (2) limitation of voir dire examination; (3) multiplicity of rape charges; and (4) disposition of a motion for acquittal addressing a charge of aggravated kidnapping.

David F.B. Zamora appeals his convictions of one count of aggravated kidnapping (K.S.A. 21-3421) and three counts of rape (K.S.A. 21-3502).

We reverse because of prosecutorial misconduct during closing argument. We find no error in the trial court's disposition of Zamora's claims relating to voir dire, multiplicity, and aggravated kidnapping.

## Facts

On the evening of October 18, 1988, A.J., a 16-year-old girl, spoke with her stepfather at a private club in Wichita about a ride to a friend's house to spend the night. Because the stepfather did not have a car, he told A.J. to ask one of the men in the bar with whom he was acquainted for a ride. A.J.'s request was unsuccessful.

However, Zamora, a 37-year-old club patron and acquaintance of the stepfather, offered A.J. a ride. Zamora drove to the 800 block of North Market, where A.J. thought the friend lived. A.J. had never been to the friend's new address and could not locate the house.

After driving around for 30 minutes to an hour, A.J. asked Zamora to take her to her stepfather's house, which was two blocks from the club. Zamora told A.J. he could not because he did not have enough gas. Zamora suggested that A.J. spend the night at his apartment, assuring her that he would take her to school the next morning. A.J. agreed. They arrived at Zamora's second-floor apartment around 9:00 p.m.

Initially, A.J. planned to sleep on the couch. Later, Zamora told her that she could sleep in the bedroom, and he would sleep on the couch. A.J. went to sleep in the bedroom fully clothed except for her shoes. The testimony differed regarding the ensuing events.

## A.J.'s Story

A.J. testified that Zamora entered the bedroom and woke her up around 1:30 a.m. He told her he wanted to make love to her and moved onto the bed. A.J. told him that she was going to scream if he did not get up. Zamora tied what A.J. thought was a rope across her mouth. A.J. attempted to push him away. Zamora removed her clothes, tied her hands behind her head, and tied one leg to the foot of the bed.

Zamora put "some kind of cream stuff" on his fingers and rubbed his fingers inside her vagina for a couple of seconds. This

testimony, which formed the basis for the charge of rape in Count Three of the amended information (insertion of fingers), was contradicted by Zamora.

About two minutes after Zamora inserted his fingers into A.J.'s vagina, he inserted his penis into her vagina and "went about his business." A.J. tried to scream but Zamora pinched her nose and mouth. This testimony formed the basis for the charge of rape in Count Two of the amended information (sexual intercourse).

Zamora then moved into the living room, leaving A.J. tied up. He returned to the bedroom 15 to 20 minutes later and again inserted his penis into her vagina and performed sexual intercourse. This testimony formed the basis for the charge of rape in Count Four.

Zamora untied A.J.'s hands, laid down beside her, and tied her left hand to his. The hand-to-hand tether was to alert Zamora if A.J. tried to escape while he was asleep. Zamora later left the bedroom and laid on the couch in the living room. Zamora unplugged the phone after A.J. tried to use it. He laid down in front of the only door to the apartment, thereby preventing her escape.

Zamora planned to pick up money and buy film the following morning. He told A.J. he intended to photograph her in outfits "like G-strings" to make it look like they were having fun and that he would use these pictures as evidence if A.J. told anyone what had happened. Zamora drove A.J. to a Western Union office and he left her in the van. A.J. exited the van and ran into an adjacent motel, telling the motel clerk she had been raped and that she needed the clerk to call "the cops." A.J. then entered a motel bathroom, locked the door, climbed out the window, and stopped a car for help.

### Zamora's Story

Zamora admitted having sex with A.J., but contended that she consented. He went into the bedroom, woke A.J., and asked her to have sex with him. A.J. responded, "Not for free." After Zamora agreed to pay her $50, they had sexual intercourse. Zamora admitted rubbing butter on A.J.'s pubic area but denied putting

his fingers inside her vagina. A.J. was not tied up during the first encounter.

After the first encounter, Zamora watched TV in the living room. He then returned to the bedroom and asked A.J. if she had ever had "gentle bondage—bondage without pain." A.J. agreed to participate as long as she was not hurt. No additional money was discussed. Zamora admitted tying A.J.'s hands, tying a bathrobe belt around her mouth, and having sexual intercourse. He denied tying her legs. He then untied her. Zamora admitted unplugging the phone but denied lying in front of the door.

In the morning, Zamora called his father in Colorado and asked him to send $50 via Western Union. Zamora planned to take A.J. to Western Union to pick up the money to pay her and then take her to school.

## Closing Argument

Zamora contends that the State committed prosecutorial misconduct during closing argument. First, Zamora argues that the prosecutor misstated his testimony. Second, Zamora asserts that the State committed reversible error when the prosecutor told the jury that if Zamora was found not guilty, he will "get away with it" again.

Zamora asserts that the State misstated his testimony when the State argued in closing that he fantasized about rape. During closing argument, the following occurred:

"[By prosecutor] Look at the Defendant's testimony, his version—remember this is a man who reads magazines about bondage, who fantasizes about tying up women, gagging them and having sex. Fantasizing about rape, Ladies and Gentlemen. . . .

. . . .

"What you have is no evidence whatsoever to support the Defendant's story that this young lady had sex with him for money. What you have is a man who fantasizes about raping women and on October 19, 1988—

"MR. GRADERT [Defense counsel] Your Honor, I object. That is not what he testified to as fantasizing.

"THE COURT: Counsel can comment on the evidence adduced. It's not improper. Overruled."

In *State v. Baker,* 219 Kan. 854, Syl. ¶ 9, 549 P.2d 911 (1976), we stated:

"In summing up a case before a jury, counsel may not introduce or comment on facts outside the evidence, but reasonable inferences may be drawn from

the evidence and considerable latitude is allowed in discussing it. Counsel may appeal to the jury with all the power and persuasiveness his learning, skill and experience enable him to use."

"There is no prejudicial error where the remarks in question are made in response to previous arguments of defense counsel." *State v. Norris*, 244 Kan. 326, Syl. ¶ 14, 768 P.2d 296 (1989).

In the present case, Zamora testified on direct examination:

"Q. [By defense counsel] Had you read or heard anything about bondage before?
"A. Yeah, that's why we tried it.
"Q. Is tying something in somebody's mouth a part of bondage?
"A. Yes, from what magazines have—it's a different type of gag or whatever, a little bit more—I don't know if the word would be sadistic or masochistic, you know, the ones that were in magazines."

In response to the prosecutor's questions on cross-examination, Zamora testified:

"Q. [Prosecutor] And you came up with this idea because of the number of magazines that you read that talks about bondage and different types of gags, etc.?
"A. It's not a question of magazines. It's just—I guess fantasy would be a word. We had good sex, my ex-wife and I. There was no pain involved. I wasn't into spanking and things like that.
"Q. Did you fantasize about liking to engage in sexual relations with women while they were bound and gagged?
"A. Well, no, sometimes—sometimes it's like having sex, but you know a position other than missionary. It's nice every once in a while to add a little spice to it.
"Q. You would agree what you said is you look at magazines with that type of thing?
"A. No, I have looked at it—yes.
"Q. That's what you said, you have looked at magazines with bondage?
"A. I have looked occasionally at magazines that are descriptive.
"Q. You said a moment ago you fantasize about that sort of thing?
"A. Yes, myself—it would be a fantasy. It's not something that's practiced, but it's a fantasy, yes."

Although Zamora did not testify that he fantasized about raping women, his testimony may be construed to suggest that he fantasized about having sex with women while they were bound and gagged. The prosecutor's inference that Zamora fantasized about forcibly having sex with women who were bound and gagged rests on the edge of reasonableness. The prosecutor's remarks occurred in response to Zamora's argument that A.J. consented

to engage in sex for money while bound and gagged. The "fantasizing about raping women" remarks, standing alone, did not create reversible error.

We now address the remarks of counsel which, when coupled with the action of the trial court in overruling Zamora's timely objection, require reversal.

Zamora properly complains of the State's final comments. The prosecutor stated: "He [Zamora] has raped this victim once. If he is found not guilty, he will get away with it again." Zamora promptly objected. The court overruled the objection. The jury retired to begin deliberations. Zamora moved for a mistrial based on the State's final comments. Zamora argued that the comments were prejudicial because they did not relate to the evidence and may scare the jury into finding him guilty so that this will not happen again. Zamora's request for a mistrial was denied.

Zamora argues that the prosecutor's statement was improper and constituted reversible error.

In *State v. Wilson*, 188 Kan. 67, 360 P.2d 1092 (1961), the prosecutor read from a newspaper article about a notorious, controversial rape case. A statement by the rape victim's mother that the rape had caused the victim to lose her mind was read from the article. Wilson objected before the article was read. The court instructed the jury that the statement was not evidence and permitted the prosecution to read the article. 188 Kan. at 71. We reversed and granted a new trial. "The argument can only be deemed an appeal to prejudice and passion and an attempt to introduce facts not disclosed by the evidence. It was extremely improper and prejudicial to defendant's rights." 188 Kan. at 72.

In *State v. Perales*, 220 Kan. 777, 556 P.2d 172 (1976), the prosecutor stated during closing argument that the defendant committed the crime and would do it again unless he was convicted. The defendant objected. The trial court sustained the objection and instructed the jury as follows: " 'I will sustain that objection to the extent, members of the jury, that what might happen in the future is pure conjecture and not to be considered.' " 220 Kan. at 780. We quoted the following rule from *State v. Warbritton*, 215 Kan. 534, Syl. ¶ 1, 527 P.2d 1050 (1974): " 'Improper remarks made by the prosecuting attorney in his

summation to the jury will not provide a basis for reversal where the jury has been instructed to disregard the same, unless the remarks were so prejudicial as to be incurable.' " 220 Kan. at 780. The trial court's instruction in *Perales* cured any possible prejudice to the defendant. 220 Kan. at 780.

In the case at bar, the prosecutor's statement was improper. The statement transcends the limits of fair discussion of the evidence. Rather than sustaining Zamora's objection and instructing the jury to disregard the remarks, the trial court overruled Zamora's objection. The result is prejudicial error.

The State argues that the trial court cured the error by a general instruction given just prior to closing argument. The trial court, in one paragraph of a four-paragraph general instruction, instructed the jury that statements and remarks of counsel are not evidence, and that it should disregard any such statements not supported by the evidence.

The general instruction prior to closing argument was not sufficient to cure the State's improper remark. See *State v. Hollis*, 240 Kan. 521, 731 P.2d 260 (1987); *State v. Pursley*, 238 Kan. 253, 710 P.2d 1231 (1985); *State v. Chears*, 231 Kan. 161, 643 P.2d 154 (1982); *State v. Perales*, 220 Kan. 777.

The State also contends that even if the prosecutor's remarks were improper and not cured by the general instruction, the error was harmless. The State relies on *State v. Bell*, 239 Kan. 229, 718 P.2d 628 (1986). Errors which do not affirmatively appear to have prejudicially affected the substantial rights of the defendant do not require a reversal when substantial justice has been done. 239 Kan. at 235.

In deciding whether improper remarks by the prosecution during closing argument constitute harmless error, the reviewing court must be able to find that the error had little, if any, likelihood of changing the result of the trial. Such a belief must be declared beyond a reasonable doubt. *State v. Buckland*, 245 Kan. 132, 141, 777 P.2d 745 (1989); *State v. Abu-Isba*, 235 Kan. 851, 859, 685 P.2d 856 (1984).

In the present case, Zamora admitted having had sexual intercourse. Consent was the primary factual dispute for the jury to determine. A.J. testified she did not consent.

There was substantial evidence supporting A.J.'s testimony relating to consent; however, we cannot declare beyond a reasonable doubt that the error had little likelihood of changing the result at trial.

The trial court's overruling of Zamora's timely objection, and the absence of a contemporaneous admonishing instruction, compounded the prosecutor's original error. Zamora was denied a fair trial.

The Model Rules of Professional Conduct, Supreme Court Rule 226 (1990 Kan. Ct. R. Annot. 210), address prosecutorial misconduct in closing arguments:

"A lawyer shall not:

. . . .

"(e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused." MRPC 3.4(e) (1990 Kan. Ct. R. Annot. 262).

MRPC 3.4(e) replaced and substantially incorporates Rule 225, DR 7-106(C)(1), (2), (3), and (4) (1990 Kan. Ct. R. Annot. 195). See Code Comparison following MRPC 3.4 in Supreme Court Rule 226 (1990 Kan. Ct. R. Annot. 263).

The ABA Standards for prosecutors also consider jury argument:

"(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

"(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds." 1 ABA Standards for Criminal Justice, The Prosecution Function, Standard 3-5.8 (1980).

Standard 3-5.8(d) is applicable in the instant case. The prosecutor predicted, "He [Zamora] has raped this victim once. If he is found not guilty, he will get away with it again."

Referring to predictions specifically, the commentary to Standard 3-5.8(d) states: "Predictions as to the effect of an acquittal on lawlessness in the community also go beyond the scope of the issues in the trial and are to be avoided. Some courts have reversed convictions where such arguments were made." 1 ABA Standards for Criminal Justice, The Prosecution Function at 3.90.

In *State v. Kelley,* 209 Kan. 699, 498 P.2d 87 (1972), counsel for the prosecution made reference in closing argument to the effect an acquittal would have on future lawlessness in the community. We stated:

"Such an argument was beyond the scope of the issues in a criminal trial and should not have been allowed. Rhetoric of this type has too frequently plagued this court as well as other appellate courts, and with varying results. In extreme cases reversal has been ordered, although generally in such instances there has been objection made at trial level as in *State v. Wilson,* 188 Kan. 67, 360 P.2d 1092 [1961]. Nonetheless in *Wilson* this court quoted approvingly the following statement from *State v. Gutekunst,* 24 Kan. 252 [1880], as follows:

" 'Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion.' (p. 73.)" 209 Kan. at 704-05.

In finding error but refusing to reverse the defendant's conviction in *Kelley,* we relied heavily on the lack of a timely objection. In Zamora's case, there is no such procedural infirmity. Zamora's convictions are reversed.

We shall address Zamora's remaining contentions as they may again appear as issues before the trial court.

### Voir Dire

Zamora contends that the trial court abused its discretion when it refused to permit him to inquire at voir dire as to the jurors' attitudes regarding bondage. We have examined the full voir dire transcript.

The purpose of the voir dire examination is to enable the parties to select competent jurors without bias, prejudice, or partiality. The nature and scope of the voir dire examination is within the sound discretion of the trial court. *State v. Haislip,* 237 Kan. 461, 485, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985).

During voir dire, the following conversation took place between defense counsel and the court:

"MR. GRADERT: (To the prospective jurors seated in the jury box) There may also be some evidence in this case of some rather unusual sexual practices.

"THE COURT: Counselor, we are not going to get into the evidence. I didn't let Janice do it, I can't let you do it, and you have already got one free one. The reason, folks, is the lawyers have plenty of time to argue after you hear the evidence. It is not fair to ask you questions about evidence you haven't heard. That's why I interceded.

"MR. GRADERT: I have no further questions. Thank you all. And I will pass this panel for cause."

The trial court prevented defense counsel from discussing the evidence at voir dire. The record reflects that the trial court also prohibited the prosecutor from commenting on the evidence. Defense counsel did not attempt to ask other questions regarding the jury's attitudes about bondage.

We characterize the trial court's ruling as a "close question." Under the specific factual development relating to the discussion of evidence, the trial court's refusal to allow defense counsel to comment on the evidence was not an abuse of discretion.

Multiplicity

Zamora asserts, with reference to the rape counts, that his fingers were used to spread a lubricant incidental to the sexual intercourse which followed, and that, therefore, the acts constituted one crime of rape, not two. Zamora's contention is not persuasive.

Rape is defined to include "sexual intercourse with a person who does not consent to the sexual intercourse." K.S.A. 21-3502.

Sexual intercourse is defined by K.S.A. 21-3501 as "any penetration of the female sex organ by a finger, the male sex organ, or any object. *Any penetration, however slight*, is sufficient to constitute sexual intercourse." (Emphasis added.)

Zamora relies on *State v. Dorsey*, 224 Kan. 152, 578 P.2d 261 (1978). In *Dorsey*, the defendant was found guilty of one count of kidnapping, two counts of aggravated oral sodomy, and three counts of attempted rape. We held that, because the charges grew out of one incident, with one victim under a single set of circumstances, the multiple convictions of oral sodomy and attempted rape were multiplicitous. Thus, only three crimes occurred: kidnapping, oral sodomy, and attempted rape. 224 Kan. at 156.

*State v. Garnes*, 229 Kan. 368, 372-73, 624 P.2d 448 (1981), restated the following rules regarding multiplicitous charges:

"The general principles for determining whether charges are multiplicitous are these:

   (1) A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution.

   . . . .

   (2) If each offense charged requires proof of a fact not required in proving the other, the offenses do not merge.

   . . . .

   (3) Where offenses are committed separately and severally at different times and at different places, they cannot be said to arise out of a single wrongful act."

In the present case, Count Three, rape by use of fingers, and Count Two, rape by use of the male sex organ, were separated only by a short interval. However, Count Three required proof of a fact not required in Count Two (proof that Zamora inserted his fingers into A.J.'s vagina). Count Two required proof of a fact not required in Count Three (proof that Zamora inserted his penis into A.J.'s vagina).

The charge of rape in Count Three is not multiplicitous of the charge of rape in Count Two.

### Motion for Acquittal—Aggravated Kidnapping

Zamora claims that the trial court erred in denying his motion for acquittal of the aggravated kidnapping charge at the close of the State's evidence.

In ruling on a motion for judgment of acquittal, if a trial court concludes from the evidence that a reasonable mind might fairly decide a defendant is guilty beyond a reasonable doubt, the motion must be denied and the case must go to the jury. On appeal, the reviewing court must determine whether a rational factfinder could have found the accused guilty beyond a reasonable doubt. *State v. Crichton,* 13 Kan. App. 2d 213, 218-19, 766 P.2d 832 (1988), *rev. denied* 244 Kan. 739 (1989).

"Aggravated kidnapping is kidnapping, as defined in section 21-3420, when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-3421.

K.S.A. 21-3420 defines kidnapping as follows:

"Kidnapping is the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person:

  "(a) For ransom, or as a shield or hostage; or

"(b) To facilitate flight or the commission of any crime; or

"(c) To inflict bodily injury or to terrorize the victim or another; or

"(d) To interfere with the performance of any governmental or political function."

Rape constitutes sufficient bodily harm to support a conviction of aggravated kidnapping. *State v. Coberly,* 233 Kan. 100, 106, 661 P.2d 383 (1983).

Zamora contends that the evidence, as presented through A.J.'s testimony, establishes a confinement incidental to the rapes and that the confinement was inherent in the nature of a repeated sexual assault. In support of this contention, Zamora cites *State v. Buggs,* 219 Kan. 203, Syl. ¶ 10, 547 P.2d 720 (1976), where we held:

"If a taking or confining is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

"(a) Must not be slight, inconsequential and merely incidental to the other crime;

"(b) Must not be of a kind inherent in the nature of the other crimes; and

"(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection."

We also stated: "Thus the 'standstill' robbery and the *ordinary rape* require as a necessary incident some 'confinement' of the victim—they are nevertheless not kidnappings solely for that reason." (Emphasis added.) 219 Kan. at 215.

Zamora also relies on *State v. Cabral,* 228 Kan. 741, 619 P.2d 1163 (1980). In *Cabral,* the defendant and the victim had been driving around all evening together. Cabral pulled into a park, locked the car, and proceeded to rape the victim. We held the confinement was inherent in the nature of the rape and incidental to the commission of the rape. 228 Kan. at 745.

In *State v. Howard,* 243 Kan. 699, 763 P.2d 607 (1988), Howard confined the rape victim for at least one and a half hours. When she attempted to leave, he restrained her. We upheld Howard's conviction for aggravated kidnapping. "Clearly Howard's actions were not slight, inconsequential, or merely incidental to the sex crimes and were not inherent in the nature of the sex crimes." 243 Kan. at 702.

Zamora did not commit the "ordinary" rape mentioned in *Buggs*. A.J.'s evidence established that he tied her up, gagged her, and raped her three times. He further confined her by lying in front of the only door to prevent her escape. He confined her from approximately 1:30 a.m. until she escaped at the Western Union office at approximately 8:30 a.m.

A.J.'s confinement was not similar to the confinement in *Cabral*. Her confinement was longer and more restrictive than the confinement in *Howard*. A.J.'s confinement was not of a kind inherent in the nature of rape and incidental to the commission of rape. The tying up made it substantially easier to rape her. Preventing A.J. from leaving substantially lessened Zamora's risk of detection.

The trial court did not err in denying Zamora's motion for acquittal.

Reversed.

ABBOTT, J., concurring and dissenting: I concur in the majority opinion and its reasoning concerning prosecutorial misconduct in closing argument, the limitation of voir dire examination, and the sufficiency of the evidence to convict for aggravated kidnapping. However, I would hold one of the rape charges to be multiplicitous. Defendant was convicted of three counts of rape. At issue are two of the counts, with the third count not at issue.

K.S.A. 21-3502 defines rape, in part, as "sexual intercourse with a person who does not consent to the sexual intercourse." In order to convict an accused, the State must prove "sexual intercourse" took place. Thus, sexual intercourse is an element of the crime of rape.

The legislature has, in a separate statute, defined "sexual intercourse" as "any penetration of the female sex organ by a finger, the male sex organ or any object." K.S.A. 21-3501.

Here, the jury was instructed that it could find the defendant guilty of rape by insertion of a finger into the victim's vagina and could find the defendant guilty of a second count of rape by insertion of his penis. The jury was not given an opportunity to determine if both acts were part of one act of sexual intercourse.

The majority holds that these counts are not multiplicitous because one count is by use of defendant's fingers and one count

is by use of the male sex organ. The majority concludes that, because different facts must be proven for each rape count, there is no multiplicity. This rationale is similar to holding that each individual penetration is an individual act of rape because it occurred at a slightly different time.

This court has long held that "[i]t is a generally accepted principle of law that the state may not split a single offense into separate parts. Where there is a single wrongful act it generally will not furnish the basis for more than one criminal prosecution. (*State v. James*, 216 Kan. 235, 531 P.2d 70; *State v. Gauger*, 200 Kan. 515, 438 P.2d 455.)" *State v. Lassley*, 218 Kan. 752, 761, 545 P.2d 379 (1976).

K.S.A. 21-3502 lists sexual intercourse as an element of rape. Then, K.S.A. 21-3501 defines the ways in which sexual intercourse may take place. Section 3501 is merely definitional, it does not set forth elements of rape. It is the act of sexual intercourse that is an element of rape, not the insertion of a finger, a penis, or an object.

Here, the victim did not have good communication skills. She first testified:

"Q. Where did he put his fingers?
"A. In my vagina.
"Q. About how long did that last?
"A. Just for a couple of seconds, not very long.
"Q. What happened after that?
"A. And then when he took his fingers out, he went ahead and went about his business and put his penis inside."

She later testified:

"Q. Now, how long after he put his fingers on you did you actually have sexual intercourse?
"A. I don't know, probably about two minutes.
"Q. A couple of minutes?
"A. Yeah."

The victim did not state that there was a two-minute interval between the insertion of defendant's fingers and the insertion of his penis. The second question and answer were framed as fingers "on her," which could have many meanings, and the jury did not consider the interval of time between the acts because it was not in issue. What we do know is that there was a very short

interval of time. Obviously, there was penetration by both the fingers and penis and either penetration can be the basis for a conviction of rape. The victim does not appear to be testifying there was literally a two-minute break between the insertion of the fingers and the penis.

The jury should have been instructed as contained in PIK Crim. 2d 57.01, all as recommended by the Notes on Use following 57.01, that the State must prove the defendant had sexual intercourse with the victim without her consent. The court should have included, as part of that instruction, the statutory definition of sexual intercourse. Instead, the trial court allowed two separate counts, of what I believe to be the same offense, to go to the jury.

In my opinion, as a matter of law, only one act of sexual intercourse took place during the time interval in question, and I would hold one count to be multiplicitous and instruct the trial court that the accused can only be retried on two rape counts.

LOCKETT and ALLEGRUCCI, JJ., join in the foregoing concurring and dissenting opinion.